Armen R. Vartian (State Bar No. 155766)
Email: avartian@gmail.com
LAW OFFICES OF ARMEN R. VARTIAN
1601 N. Sepulveda Blvd #581
Manhattan Beach CA 90266
Tel: (310) 372-1355
Fax: (866) 427-3820

Keith A. Attlesey (State Bar No. 168470)
Email: kattlesey@attleseystorm.com
Suzanne Shaw Storm (State Bar No. 229003)
Email: sstorm@attleseystorm.com
ATTLESEY | STORM, LLP
2552 Walnut Avenue, Suite 100
Tustin, CA 92780
Tel: (714) 508-4949
Fax: (714) 508-0015

Attorneys for Plaintiff

FILED
2010 SEP -7 PM 3:25
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLECTORS UNIVERSE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AL ROSSMAN, an individual; RICK WESSELINK, an individual; SILVANO DIGENOVA, an individual; GREG KRILL, an individual; ROBERT LEHMANN, an individual; DOES 1-10, individuals and/or entities whose identities are currently unknown,<br><br>Defendants. | **NO. CV10-03602 SJO(MLGX)**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF LANHAM ACT; VIOLATION OF RICO; COMMON LAW FRAUD; CALIFORNIA UNFAIR COMPETITION; BREACH OF CONTRACT; CONSPIRACY; DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff COLLECTORS UNIVERSE, INC., for its Second Amended Complaint in this action, alleges upon information and belief as follows:

## JURISDICTION AND VENUE

1. This action arises under 18 U.S.C. §1962 and the Lanham Act, 15 U.S.C. §1125, and this Court has original jurisdiction of Plaintiff's federal claims under 18 U.S.C. §1964(c), 15 U.S.C. §§1121 and 1125(a), 28 U.S.C. §§1338(a) and (b), and 28 U.S.C. §§1331, and supplemental jurisdiction over Plaintiff's California statutory and common law claims pursuant to 28 U.S.C. § 1367(a), since the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2. Venue is proper in this Judicial District under 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b) as Plaintiff's corporation is headquartered in California, Defendants transact their affairs and do business in this District, a substantial portion of the events, omissions and property which is the subject matter of this action are located in this District, and defendants agreed by contract that this Judicial District is a convenient forum.

## PARTIES

3. At all times relevant hereto, Plaintiff COLLECTORS UNIVERSE, INC. ("CU") was and now is a Delaware corporation, with its principal place of business in Santa Ana, California, and was and now is engaged, inter alia, in the

authentication and grading of collectible coins through its Professional Coin Grading Service ("PCGS") division.

4. Upon information and belief, Defendant Al Rossman ("Rossman") is a natural person residing in Nevada, Defendant Rick Wesselink ("Wesselink") is a natural person residing in Mission Viejo, California in this Judicial District, Silvano DiGenova ("DiGenova") is a natural person residing in Laguna Beach, California in this Judicial District, Greg Krill ("Krill") is a natural person residing in St. Helena, California, Robert Lehmann ("Lehmann") is a natural person residing in Cumberland, Maryland, and Defendants DOES 1-10 are parties the identities of whom/which are presently unknown to Plaintiff, but who are believed to be natural persons or other entities that reside and/or have a principal place of business in the State of California. Rossman, Wesselink, DiGenova, Krill, Lehmann and DOES 1-10 are hereinafter collectively referred to as "Defendants").

5. Each defendant was, at all material times, the agent of every other defendant acting within the course and scope of such agency with respect to the conduct alleged in this complaint. Each defendant is, as an agent, conspirator, aider and abettor or other liable person, jointly and severally liable with each other defendant for the acts and conduct alleged in this complaint.

/ / /

/ / /

## GENERAL ALLEGATIONS

6. PCGS is the leading coin authentication and grading service in the world, having graded millions of coins since its inception in 1986. CU has expended money, time and effort promoting PCGS's business under the PCGS name, and to make PCGS's name familiar to the public at large and to coin dealers and others involved in the coin industry. PCGS has built a valuable goodwill under the name PCGS and has become the recognized market leader in the business of authenticating and grading coins.

7. PCGS authenticates and grades coins according to PCGS's standards as interpreted and applied by experts employed by CU as PCGS graders. Once a coin has been authenticated and graded, PCGS places the coin in a sealed, tamper-evident hard plastic holder along with a paper insert which bears PCGS's name and logo, a description of the coin including the grade assigned by PCGS on a 1-70 scale, and a unique PCGS certification number and bar code relating to the particular coin. The plastic holder itself contains an embossed variation of the PCGS logo, and in some cases a hologram containing either "PCGS" or "Collectors Universe." CU maintains an on-line database of PCGS-certified coins classified according to PCGS certification numbers, so that anyone viewing an image of a PCGS-certified coin can check whether the certification number appearing on the paper insert is, in fact, the correct number assigned by PCGS to that coin.

8. PCGS guarantees that any coin in a PCGS holder is genuine and has been properly graded, and owners of PCGS-graded coins which are found to be counterfeit or overgraded may submit those coins to PCGS for reimbursement of any difference in value arising from PCGS's error (the "PCGS Guarantee").

9. PCGS does not grade coins that have been "doctored", i.e., artificially altered in order to diminish or conceal defects in the coins, enhance the coins' appearance, and falsely obtain higher grades. Any dealer who submits coins to PCGS, including Defendants herein, executes the PCGS Dealer Agreement, a written agreement providing terms and conditions for submitting coins to PCGS. The Agreement includes, inter alia, the following:

> 5. Impaired or Altered Coins. (a) Dealer acknowledges that PCGS will not grade coins which, in the judgment of PCGS, bear evidence of harsh cleaning, artificial toning, damaged surfaces, altered surfaces or PVC damage, or other similar impairments or evidence of coin "doctoring," as described below. Dealer agrees that it will not knowingly submit any coins for grading which have been altered in any way, and acknowledges that the determination as to whether a coin should be graded shall be made by PCGS in accordance with its standards. However, because the determination by PCGS to reject such impaired coins will require a review by PCGS's grading experts, Dealer will be required to remit, as set forth herein, the standard grading fee for any such coins that are submitted to PCGS.
>
> (b) Dealer shall not "doctor" coins or knowingly submit to PCGS coins which have been "doctored". Coin "doctoring" involves the alteration of the appearance of a coin to attempt to increase its value, and may involve, among other things, adding substances to coins (such as, among other things, putty, wax, facial oils, petroleum jelly or varnish); treating coins with chemicals (such as, among other things, potash, sulfur, cyanide, iodine or bleach); heat treating coins in

any way to alter their appearance; re-matting ("skinning") proof gold; "tapping" and "spooning" (i.e., physically moving surface metal to hide marks); filing rim nicks; or repairing coins (re-tooling metal). Dealer and PCGS agree that PCGS would suffer irreparable damages if Dealer were to engage in coin "doctoring" and that PCGS shall be entitled to not only compensatory damage but also preliminary and final injunctive relief for any breach of Dealer's obligation not to "doctor" coins or knowingly to submit "doctored" coins to PCGS. Dealer agrees that in the event PCGS incurs any attorney fees and/or cost and expenses as a result of said "doctoring", including but not limited to investigating claims of alleged "doctoring", and engaging in legal proceedings with Dealer or any third party relating to same, PCGS shall be entitled to reimbursement of such fees and costs from Dealer.

13. Legal Compliance. In all activities involving PCGS coins, Dealer warrants that it is and shall remain in compliance with all applicable federal and state antitrust, securities, commodities, consumer protection, unfair trade practices, fraud, and tax laws, and any other applicable laws or regulations. Dealer agrees that in the event PCGS incurs any attorney fees and/or cost and expenses as a result of Dealer's violation of this warranty, including but not limited to investigating claims of alleged violations, and engaging in legal proceedings with Dealer or any third party relating to same, PCGS shall be entitled to reimbursement of such fees and costs from Dealer.

22. Governing Law, Dispute Resolution, Venue and Attorney's Fees. This Agreement is delivered and accepted in the State of California and it is the intention of the parties that it be governed by and construed in accordance with the substantive laws of that State, without regard to conflicts of laws principles. In the event of any controversy, claim, or dispute between the parties hereto arising from, under, out of, or relating to this Agreement or breach thereof, Dealer expressly agrees to the jurisdiction of any Court within the County of Orange, State of California, and further agrees that the County of Orange is a convenient forum for any such disputes arising from, under or pursuant to this Agreement. The prevailing party shall be entitled to recover all of its reasonable attorneys' fees, expenses and costs, including such costs that might not otherwise be recoverable as costs in the absence of this Agreement.

10. "Doctoring" U.S. and foreign legal tender laws is a federal crime under 18 U.S.C. §331:

> Whoever fraudulently alters, defaces, mutilates, impairs, diminishes, falsifies, scales or lightens and of the coins minted at the mints of the United States…; or
>
> Whoever fraudulently possesses, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell…any such coin, knowing the same to be altered, defaced, mutilated, impaired, diminished, falsified, scaled or lightened
>
> Shall be fined under this title or imprisoned not more than five years, or both.

11. Defendants have engaged in "doctoring" United States coins for the purpose of submitting the "doctored" coins to PCGS for certification and grading for a period of years. Plaintiff is informed and believes and on that basis alleges that the various Defendants each participated in said "doctoring" activities in different ways, including but not limited to selecting coins for "doctoring," financing the purchase of said coins, performing the actual "doctoring," submitting the "doctored" coins to PCGS, and arranging for the "doctored" coins' sale after successfully obtaining PCGS certification. For example, Plaintiff is informed and believes that Defendants Rossman and Lehmann[1] do not submit coins to PCGS as "authorized dealers," while DiGenova and Krill do so on behalf of the group. In addition, Defendants have used another PCGS authorized dealer, Eric Steinberg

[1] Defendant Lehmann was an authorized PCGS coin dealer until 2004.

("Steinberg") who resides in Florida, to submit coins on their behalf. Plaintiff is further informed and believes and on that basis alleges that Defendants Wesselink and DiGenova finance the purchase of the coins and Defendants Rossman, Wesselink, Lehmann and DiGenova "doctor" coins on behalf of themselves and the other Defendants. Plaintiff is informed and believes and on that basis alleges that Defendants' "doctoring" methods include, but are not limited to, lasering the surfaces of extremely rare proof gold coins to remove surface imperfections. Defendants also build up commonly-worn or weakly-struck portions of coins and specifically Liberty Heads and the crossbands on dimes with exotic metals such as Indium, and other physical and chemical processes which are not detectable without the use of spectroscopy.

12. The Defendants' "doctoring" activities involved frequent use of interstate mails and wires. For example, Plaintiff is informed and believes that Defendant DiGenova would contact Steinberg by telephone from California to Florida to arrange the interstate transportation of coins owned by Defendants DiGenova and Rossman to Steinberg for submission to PCGS. As DiGenova resides and works in Orange County, California – PCGS's location – and Rossman resides and works in Nevada, the involvement of Steinberg in Florida was done entirely in furtherance of the "doctoring" scheme by concealing Defendants DiGenova and Rossman's involvement with the coins and had no business

justification. This was likewise the case with contacts and shipments of coins among the California-based Defendants and Rossman (Nevada).

13. Defendants Lehmann, DiGenova, Krill and Steinberg, when submitting "doctored" coins to PCGS, represented to PCGS that these coins had natural surfaces, intending to deceive PCGS's graders so that the "doctored" coins would be certified by PCGS and then sold in the rare coin marketplace, where they would be covered by PCGS's cash guarantee. In other cases, after the coins were "doctored" as described herein, Defendants would submit the coins to PCGS through other authorized PCGS dealers as yet unidentified, but likewise without any disclosure that the coins had been "doctored" prior to submission.

14. Upon information and belief, Defendants have successfully obtained PCGS's certification of certain "doctored" coins, thereby selling said coins to numerous coin dealers and others in California and/or by mail nationwide. In every such instance, Defendants knew and intended that by having the coins certified by PCGS they would thereby create a belief in the purchaser of the coin that the coin was a genuine PCGS-certified coin with original surfaces and protected by the PCGS guarantee. The direct and intended result of the acts identified in paragraphs 11 through 13 above was to cause dealers and the public to be deceived and confused concerning the condition of the coins passed off by Defendants. In other words, purchasers and prospective purchasers were led to

believe that the coins merited the grades printed on the PCGS insert in the holder containing the coin, when in fact Defendants knew such was not the case.

15. Defendants' techniques are designed and intended to avoid detection by CU and the coins' owners for many years, but over time the chemicals applied to coins' surfaces or otherwise involved in "doctoring" create noticeable changes in the coins' appearance, thereby revealing that the coins had been "doctored". At that point the coins' owners may notify CU and receive compensation from CU under the PCGS Guarantee.

16. Plaintiff is informed and believes and based thereon alleges that among the coins Defendants doctors and submitted to PCGS were the following:

(a) On or about November 29, 2006, Steinberg submitted an 1801 $10 gold piece to PCGS. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant DiGenova "doctored" the coin by adding a foreign substance to the coin's surface to cover marks. Plaintiff repurchased the coin on June 16, 2009 for $18,000 under the PCGS Guarantee.

(b) On or about December 16, 2009, Steinberg submitted an 1881 $2.5 gold piece belonging to Defendant Rossman on behalf of Defendant DiGenova to PCGS for grading. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant DiGenova "doctored" the coin by lasering off lines on the coin's surface. Upon determining the coin had been "doctored" and would be part of a lawsuit, Plaintiff held the coin pending trial in this action.

(c) On or about December 16, 2009, Steinberg submitted an 1885 $5 gold piece belonging to Defendant Rossman on behalf of Defendant DiGenova to PCGS for grading. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant DiGenova "doctored" the coin by adding chemicals to the coin's surface. Upon determining the coin had been "doctored" and would be part of a lawsuit, Plaintiff held the coin pending trial in this action.

(d) On or about May 17, 2001, Defendant DiGenova's company, Tangible Assets, submitted a 1918-D Mercury 10c to PCGS for grading. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant DiGenova "doctored" the coin by rebuilding the crossbands on the dime. Plaintiff repurchased the coin on April 27, 2010 for $90,000 under the PCGS Guarantee.

(e) On August 28, 2008, Defendant DiGenova resubmitted an 1879 $4 Stella gold piece valued at $200,000 after it had been originally submitted by Heritage Galleries on May 8, 2008, a couple of months earlier. Plaintiff is informed and believes upon examining the coin and before and after photos and on those bases alleges that prior to submitting the coin Defendant DiGenova "doctored" the coin by removing lines on the reverse of the coin. PCGS refused to grade the coin.

(f) On or about April 8, 2004, an 1833 Bust 50c was submitted by Superior Galleries, Defendant DiGenova's company at the time. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant DiGenova "doctored" the coin by chemically coloring it to alter the coin's appearance. On or about June 22, 2008, Plaintiff repurchased the coin for $8,500 under the PCGS Guarantee.

(g) On or about May 30, 2001, Defendant DiGenova's company, Tangible Assets submitted a 1928-D Standing Liberty 25c to PCGS for grading. Plaintiff is informed and believes and upon that basis alleges that prior to submitting the coin, Defendant Rossman "doctored" the coin by rebuilding the Liberty's Head to make it appear full. In or about March of 2005, Plaintiff repurchased the coin for $4,650 under the PCGS Guarantee.

(h) In or about April of 1998, Defendant Krill submitted a 1904 $20 gold piece to PCGS to be graded. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin Defendants Krill and/or Rossman "doctored" the coin by applying a foreign substance to the coin. In or about December of 2007, Plaintiff repurchased the coin for $1,250 under the PCGS Guarantee.

(i) In or about July of 2001, Defendant Lehmann submitted a 1926-D Standing Liberty 25c to PCGS for grading. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin to PCGS for grading that Defendant Rossman "doctored" the coin prior to submission by rebuilding the

Liberty's Head. In or about June of 2007, Plaintiff repurchased the coin for $7,500 under the PCGS Guarantee.

(j) On or about August 13, 2001, Defendant Lehmann submitted a 1926-S Mercury dime to PCGS for grading. Plaintiff is informed and believes and on that basis alleges that prior to submitting the coin, Defendant Lehmann, Rossman and/or DiGenova "doctored" the coin by rebuilding the crossbands on the dime. In or about September of 2009, Plaintiff repurchased the coin for $4,887 under the PCGS Guarantee.

(k) In or about April 2001, Dan Ratner submitted a 1918-S quarter originally to PCGS for grading. Plaintiff is informed and believes and upon that basis alleges that prior to submitting the coin, Defendant Rossman "doctored" the coin by rebuilding the Liberty's Head to make it appear full. In or about February of 2007, Plaintiff repurchased the coin for $3,500 under the PCGS Guarantee.

(l) On or about June of 2004, Steinberg submitted a 1901 Proof $20 Liberty gold piece on behalf of Defendants. Plaintiff is informed and believes and on that basis alleges that prior to submission of the coin, Defendant DiGenova "doctored" the coin by coating the coin in a foreign substance and altering the face and obverse fields. In July of 2010, Plaintiff repurchased the coin for $40,000 under the PCGS Guarantee.

(m) On August 28, 2008, Defendant DiGenova submitted an 1886 proof $3 gold piece valued at $20,000 after it had been sold at auction by Heritage Galleries. Plaintiff is informed and believes upon examining the coin and before and after photographs that prior to submitting the coin Defendant DiGenova "doctored" the coin by smoothing marks and lines in the left and right obverse fields and smoothing several large marks in the hair. PCGS refused to grade the coin.

(n) On August 28, 2008, Defendant DiGenova submitted an 1898 proof $2.5 gold piece valued at $20,000. Plaintiff is informed and believes upon examining the coin and before and after photographs that prior to submitting the coin Defendant DiGenova "doctored" the coin by removing a scratch from above the head of Ms. Liberty. PCGS refused to grade the coin.

17. Defendants continue to engage in "doctoring" activities. On July 1, 2010, well after initiation of this Lawsuit, Defendant Krill sent a package of coins

to Defendant Wesselink with written instructions to "doctor" those coins to achieve certain changes in the coins' appearance:

(a) 1861 $5 gold piece. Defendant Krill instructed Wesselink to perform a "very light clean-up" to make the coin, which no longer merited a grade of "uncirculated" because of wear on its surfaces "look new" (uncirculated) thereby increasing the value of the coin from $700 to $1,600 - $3,300.

(b) 1909 $5 gold piece. Defendant Krill initially instructed Defendant Wesselink to keep the coin "fresh with just a light clean up." However, Defendant Krill was unhappy with the work performed by Defendant Wesselink and sent the coin back asking Defendant Wesslink "[w]here'd the luster go? Looking flat, reddish mono-look."

(c) 1854 $3 gold piece. Defendant Krill instructed Defendant Wesselink to keep the coin "fresh" with a "light rub."

(d) 1851 $1 gold piece. Defendant Krill instructed Defendant Wesselink to perform a "light clean up."

One of the coins in the shipment was in a PCGS holder, and two others had been removed from PCGS holders prior to shipment. Plaintiff is informed and believes and based thereon alleges that Defendants' intent was for Wesselink to "doctor" the coins in accordance with Krill's instructions, and then resubmit the coins to PCGS to obtain higher grades than the coins had previously received from PCGS.

18. By reason of the foregoing unlawful acts, Defendants have caused, and are continuing to cause, substantial and irreparable damage and injury to CU and to the public and Defendants have benefited from such unlawful conduct and will

continue to carry out such unlawful conduct and to be unjustly enriched thereby unless enjoined by this Court.

## COUNT ONE – LANHAM ACT

19. CU repeats and realleges each and every allegation contained in Paragraphs 1-18 hereof as though set forth in full here.

20. Defendants' aforesaid acts constitute an actionable wrong under 15 U.S.C. §1125(a) in that they knowingly and willfully used in connection with their goods a false designation of origin and a false description and representation as to their coins, including words, symbols and numbers tending falsely to describe or represent their coins as having natural surfaces and meriting the grades assigned to them by PCGS, and have caused such coins to enter into, and be transported and used in interstate commerce with knowledge of the falsity of such designation of origin, description and representation.

21. By reason of the foregoing unlawful acts, Defendants have caused, and are continuing to cause, substantial and irreparable damage and injury to CU and to the public and Defendants have benefited from such unlawful conduct and will continue to carry out such unlawful conduct and to be unjustly enriched thereby unless enjoined by this Court.

22. As a proximate and direct result of Defendants' acts of passing off, CU has sustained damages in an as yet unascertained amount to be proven at trial.

## COUNT TWO -- RICO

23. CU repeats and realleges each and every allegation contained in Paragraphs 1-22.

24. Defendants are "persons" associated with one another as an "enterprise" engaged in, or the activities of which affect, interstate commerce in the meaning of 18 U.S.C. §1961. Defendants Rossman, Wesselink, DiGenova, Krill and Lehmann associated together and with Steinberg for the common purpose of "doctoring" and submitting "doctored" United States coins to PCGS for grading as described in paragraph 16 herein, either directly through authorized dealers or indirectly through other dealers in an effort to defraud PCGS's graders so that the "doctored" coins would be certified by PCGS and then sold in the rare coin marketplace for considerably in excess of their fair market value prior to the "doctoring", and many multiples in excess of their actual fair market value as "doctored" coins (which, in some cases, is no more than the value of the metal contained in the coins).

25. Defendants engaged in a series of criminal activities, including but not limited to violations of 18 U.S.C. §1341 (mail fraud), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §2320 (trafficking in counterfeit goods and services) which constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1962. As described above, Defendants used interstate wires and mails in furtherance of their scheme, and in fact those uses were essential to arranging for

the "doctoring" activities themselves as well as concealing the participation of certain Defendants from those activities.

26. Defendants invested the income, or the proceeds of income, derived from their pattern of racketeering activity described herein into their ongoing enterprise in violation of 18 U.S.C. §1962(a). These investments included the use of profits from the scheme to purchase more coins for "doctoring", pay the expenses of the various participants and provide them with sufficient profit to motivate further unlawful activity.

27. Defendants acquired or maintained, directly or indirectly, an interest in or control of an enterprise through their pattern of racketeering activity in violation of 18 U.S.C. §1962(b). Plaintiff is informed and believes and based thereon alleges that Defendants divided the enterprise's net profits as joint venturers, perhaps sharing those profits with other, as yet unnamed, parties.

28. As described herein, Defendants were and are employed by or associated with an enterprise and conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through their pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

29. Defendants conspired to violate 18 U.S.C. §1962(a), (b), and (c). The conspiracy purchased coins for "doctoring", arranged for the coins to be

"doctored", submitted the coins to PCGS for certification, and sold the certified coins for excessive amounts in the marketplace.

30. By reason of Defendants' unlawful acts as described above, Plaintiff has been injured in its business or property within the meaning of 18 U.S.C. §1964(c).

**COUNT THREE – COMMON LAW FRAUD**

31. CU repeats and realleges each and every allegation contained in Paragraphs 1-30 hereof as though set forth in full here.

32. Defendants made representations of fact to CU concerning the coins they submitted to PCGS for grading, and intended that CU rely upon those representations. Defendants also omitted to disclose information to CU regarding their "doctoring" activities.

33. CU did, in fact, reasonably rely upon Defendants' statements and omissions in certifying coins, to its detriment.

34. By reason of Defendants' unlawful acts and omissions as described above, Plaintiff has been damaged in an amount according to proof at trial.

35. In acting as set forth herein, Defendants acted willfully, fraudulently, maliciously, and in wanton disregard of CU's rights. Therefore, CU seeks exemplary damages from Defendants in an amount according to proof at trial.

///

///

## COUNT FOUR – CALIFORNIA UNFAIR COMPETITION

36. CU repeats and realleges each and every allegation contained in Paragraphs 1-35 hereof as though set forth in full here.

37. Defendants' aforesaid acts constitute unlawful, unfair and fraudulent business practices, as prohibited by the common law and by California Business & Professions Code §17200 read with §§17203 and 17205. They constitute violations of RICO and the federal mail and wire fraud statutes, as well as 18 U.S.C. §331.

38. By reason of Defendants' unlawful acts as described herein Defendants have caused, and are continuing to cause, substantial and irreparable damage and injury to CU and to the public and Defendants have benefited from such unlawful conduct and will continue to carry out such unlawful conduct and to be unjustly enriched thereby unless enjoined by this Court.

39. CU has no adequate remedy at law.

40. As a proximate and direct result of Defendants' unlawful conduct and acts of unfair competition, CU has sustained damages in an as yet unascertained amount, but exceeding $100,000.

41. In acting as set forth herein, Defendants acted willfully, fraudulently, maliciously, and in wanton disregard of CU's rights. Therefore, CU seeks exemplary damages from Defendants in an amount according to proof at trial.

## COUNT FIVE – BREACH OF CONTRACT

42. CU repeats and realleges each and every allegation contained in Paragraphs 1-41 hereof as though set forth in full here.

43. Defendants have breached their obligations under the PCGS Dealer Agreement not to submit "doctored" coins, and have also violated those portions of the Agreement prohibiting unlawful conduct in connection with their PCGS submissions.

44. By reason of Defendants' unlawful acts as described herein, Plaintiff has been damaged in an amount according to proof at trial.

## COUNT SIX – CONSPIRACY

45. CU repeats and realleges each and every allegation contained in Paragraphs 1-44 hereof as though set forth in full here.

44. Defendants formed an agreement to "doctor" coins and submit them to PCGS for certification, in violation of the various statutory and common law rules set forth above, and committed various overt acts in furtherance of this agreement.

45. By reason of Defendants' unlawful acts as described herein Plaintiff has been damaged in an amount according to proof at trial.

## COUNT SEVEN – DECLARATORY JUDGMENT

46. CU repeats and realleges each and every allegation contained in Paragraphs 1-45 hereof as though set forth in full here.

47. Defendant Rossman contends that certain coins, to wit an 1881 Proof U.S. $2 ½ gold piece and an 1885 Proof U.S. $5 gold piece, belong to him and should be returned to him, though the coins were submitted to PCGS for certification by Steinberg on behalf of DiGenova. Defendant Rossman, through counsel, has threatened to sue CU for conversion if CU retains possession of these coins. Plaintiff likewise expects that Defendant Krill will demand the return of the coins described in Paragraph 17 of this Complaint.

48. CU believes that these coins are evidence of a crime as well as of civil wrongs detailed in this Complaint, and that returning them to Defendants Rossman and/or Krill would result in the coins' loss and/or destruction. CU is willing to submit the coins for this Court's safekeeping pending trial and/or the involvement of federal enforcement authorities.

49. CU asks this Court to declare that CU may maintain possession of the coins pending trial, or provide them to this Court for safekeeping as evidence.

**WHEREFORE**, CU prays for judgment against Defendants as follows:

1. That Defendants, their agents, servants, employees, successors, assigns and all those controlled by them, be permanently enjoined from submitting coins to PCGS for certification, either directly or through a third party, which were "doctored" as defined herein;

///

2. That Defendants be ordered to deliver for destruction all "doctored" coins in their possession which have been placed in PCGS holders, including the PCGS coin inserts and holders;

3. That Defendants be ordered to account for and pay over to CU all gains, profits and advantages derived by them from their submission of "doctored" coins to PCGS and/or from any other unlawful conduct as described herein;

4. That Defendants be ordered to pay all damages sustained by CU, or, alternatively, provide restitution and disgorge profits, resulting from Defendants' acts of unfair trade practices and unfair competition;

5. That Defendants be ordered to pay to CU a sum equal to three times the amount of CU's actual damages as provided by 18 U.S.C. §1964(c);

6. That Defendants be ordered to pay to CU exemplary damages according to proof;

7. That Defendants be ordered to pay CU's costs of this action, including reasonable attorney's fees; and

8. That the Court grant CU such further relief as the Court deems just.

Dated: September 7, 2010

ATTLESEY | STORM, LLP

[signature]

Suzanne Shaw Storm
Attorneys for Plaintiff

Of Counsel
Armen R. Vartian

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: September 7, 2010

ATTLESEY | STORM, LLP

Suzanne Shaw Storm
Attorneys for Plaintiff